# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CRYSTAL S.[1],                                        Case No. 1:20-cv-627
      Plaintiff,                             Litkovitz, M.J.

      vs.

COMMISSIONER OF                                      **ORDER**
SOCIAL SECURITY,
      Defendant.

Plaintiff Crystal S. brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for

judicial review of the final decision of the Commissioner of Social Security ("Commissioner")

denying plaintiff's application for disability insurance benefits ("DIB"). This matter is before

the Court on plaintiff's statement of errors (Doc. 17), the Commissioner's response in opposition

(Doc. 20), and plaintiff's reply memorandum (Doc. 21).

## I.  Procedural Background

Plaintiff filed her application for DIB on April 25, 2017, alleging disability since April 9,

2017, due to diabetes, diabetic neuropathy, and an anxiety disorder. (Tr. 218). The application

was denied initially and upon reconsideration. Plaintiff, through counsel, requested and was

granted a *de novo* hearing before administrative law judge ("ALJ") Renita K. Bivins on April 11,

2019. Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ hearing. (Tr.

44-81). On July 1, 2019, the ALJ issued a decision denying plaintiff's DIB application. (Tr. 20-

---

[1]Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

43).  This decision became the final decision of the Commissioner when the Appeals Council denied review on June 17, 2020.

## II.  Analysis

### A.  Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i) -(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2022.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since April 9, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: diabetes mellitus; peripheral neuropathy; Charcot of the right heel; irritable bowel syndrome; anxiety and obsessive-compulsive disorder; depressive disorder and bipolar disorder (20 CFR 404.1520(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, [the ALJ] finds that the [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she is only able to lift and carry up to 20 pounds occasionally and 10 pounds frequently; she is able to stand and/or walk for 6

hours per 8 hour day and sit for 6 hours per 8 hour day with normal breaks[;] she can frequently climb ramps and stairs and occasionally climb ladders, rope[s], [and] scaffolds; she can frequently balance, stoop, kneel, crouch and crawl; she can frequently finger and handle bilaterally; she must avoid concentrated exposure to heights, dangerous moving machinery, extreme heat and extreme cold, dust, humidity, and vibration; she can work in an environment with no more than a moderate noise level; she can understand, remember, and carry out complex instructions with no fast-paced production demands; she can maintain sufficient concentration, attention and pace to complete tasks with no requirement for fast-paced production; she can interact with the public occasionally or no more than one third of the workday; [and] she can interact appropriately with coworkers and supervisors on a superficial basis such that there is no requirement for conflict resolution or arbitration.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[2]

7. The [plaintiff] . . . was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569 and 404.1569a).[3]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from April 9, 2017, through the date of this decision (20 CFR 404.1520(g)).

---

[2] Plaintiff's past relevant work was as a nurse assistant, a semi-skilled, medium job performed at the light level of exertion; a phlebotomist, a semi-skilled, light job; and a retail salesclerk, a semi-skilled, light job performed at the medium level of exertion.  (Tr. 35, 73-74).

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light, unskilled occupations such as routing clerk (55,000 jobs in the national economy), marking clerk (300,000 jobs in the national economy), and mail clerk (300,000 jobs in the national economy).  (Tr. 36, 74, 75-76).

(Tr. 25-37).

### C.     Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,*

478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*,

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

(1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a

preponderance. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In

deciding whether the Commissioner's findings are supported by substantial evidence, the Court

considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the

disability determination.  Even if substantial evidence supports the ALJ's conclusion that the

plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right."  *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).

### D.  Relevant Evidence

### 1.  *Plaintiff's Hearing Testimony*

Plaintiff testified that she resides in her parents' home with her eleven-year-old child. (Tr. 49). She possesses a valid driver's license and has typically driven one or two days per week since 2017. (*Id.*).

Plaintiff experiences leg shocks and numbness in her hands, fingers, legs and feet. (Tr. 60-61). She wears diabetic socks, but standing too long causes her legs to swell and hurt. (Tr. 62, 66). If she sits too long, her lower back aches, and her legs swell, ache, and become numb. (Tr. 62, 67). She has not been treated by a psychiatrist or psychologist since 2017 or been hospitalized for mental health issues. (Tr. 64).

She uses her phone for research, email, social media, and online shopping because her area lacks reliable wi-fi. (Tr. 64). She is able to prepare meals, do laundry, and shop for basic needs. (Tr. 65). Plaintiff can dress herself except for her socks, and she has no difficulty showering. (Tr. 68).

Due to irritable bowel syndrome (IBS), plaintiff is usually in the bathroom three to four times a day from 15 to 30 minutes (but sometimes up to 45 minutes) each time. (Tr. 70-71). She usually sits and elevates her legs from eight to ten hours per day. (Tr. 71). She wears protective clothing that must be changed two to three times per day. (Tr. 72).

   *2. State agency consultants*

State agency psychological consultant Cynthia Waggoner, Psy.D., assessed plaintiff's mental residual functional capacity on July 24, 2017. Dr. Waggoner concluded that plaintiff is moderately limited in her ability to carry out detailed instructions, maintain concentration for extended periods, and work in coordination or proximity to others without being distracted. (Tr.

91).  She also concluded that plaintiff could "perform 1-4 step moderately complex work tasks without strict, fast paced production demands" and "maintain superficial interactions" with others in the workplace and with the general public.  She also opined that plaintiff is limited to positions which do not require more than occasional interactions with the general public.  (Tr. 91-92).

State agency medical consultant Dr. Maria Congbalay reviewed the medical records on August 11, 2017.  Dr. Congbalay concluded that plaintiff had the RFC to occasionally lift or carry 20 pounds, frequently carry 10 pounds, and stand, walk, and sit (with normal breaks) approximately six hours in an eight-hour workday.  (Tr. 89).  Dr. Congbalay further determined that—despite postural limitations due to diabetic neuropathy—plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl and could occasionally climb ladders, ropes or scaffolds.  (Tr. 89-90).

On November 9, 2017, the state agency medical and psychological consultants reached conclusions identical to those of Drs. Waggoner and Congbalay.  (Tr. 104-07).

*3.  Hospitalizations*

In April 2017, plaintiff was hospitalized for bowel resection surgery due to a small bowel obstruction where part of her colon was removed.  (Tr. 380-469).  In August 2017, she was again hospitalized complaining of progressive abdominal pain, multiple episodes of diarrhea per day, and resulting weight loss.  (Tr. 607).

In May 2018, plaintiff was hospitalized for nausea, vomiting, diarrhea, and abdominal pain.  She was diagnosed with diabetic ketoacidosis without coma associated with diabetes mellitus due to underlying condition (HCC) and colitis.  (Tr. 687).

On August 5, 2018, plaintiff presented at the emergency department with pain in her right foot and heal, bilateral leg swelling (right more than left), and a 3 centimeter diabetic "necroloamis" on her mid-right lower leg.  (Tr. 716, 718).  Plaintiff presented with a blister on the heel of her right foot and progressive pain with weight bearing and ambulation.  (Tr. 720).  She was diagnosed with cellulitis of the right foot and insulin dependent diabetes mellitus (HCC).  (Tr. 719).  An MRI of the right foot revealed a nondisplaced fracture of the posterior calcaneal tuberosity with extensive bone marrow edema throughout the calcaneus.  The reviewing physician noted that this type of fracture in the setting of diabetes can occasionally be neuropathic in etiology.  (Tr. 744).  The MRI also showed a posterior heel skin blister compatible with cellulitis.  (*Id*.).

Plaintiff was next seen again on August 23, 2018 for acute right ankle pain, pain in the right heel, and a closed displaced fracture of the right calcaneus.  (Tr. 757).  Testing was positive for acute deep vein thrombosis.  (Tr. 760).

On October 11, 2018, plaintiff was unresponsive and taken to the emergency department.  (Tr. 768).  Plaintiff was diagnosed with hypoglycemia.  (Tr. 774).

*4. Dr. Michael Justin, M.D.*

Dr. Justin, plaintiff's primary care physician, treats plaintiff's IBS, diabetes, neuropathy, anxiety, and urinary issues.  (Tr. 55-56).  On October 16, 2017, plaintiff presented with IBS

symptoms and reported soiling herself at night.  (Tr. 884).  Since her IBS symptoms began,

plaintiff had lost more than 40 pounds.  (Tr. 884).  Dr. Justin noted that plaintiff appeared

emaciated and weak, and a CT scan revealed a 4 cm. abdominal hematoma.  (Tr. 884).  Lab tests

indicated a urinary tract infection, likely related to excessive diarrhea.  (Tr. 886).

On January 25, 2018, plaintiff presented with hypoglycemia and loss of appetite.  (Tr.

889).  Dr. Justin assessed insulin dependent diabetes mellitus (since age 15), leg cramps,

neuropathy, fatigue, malabsorption, anxiety, and depression, but plaintiff denied experiencing

diarrhea or urinary frequency at that time.  (Tr. 889).  He instructed plaintiff to engage various

specialists to address her neuropathy and diabetes mellitus.  Dr. Justin continued plaintiff on

various medications, including Celexa for anxiety and depression.  (Tr. 891).

On May 17, 2018, plaintiff saw Dr. Justin for follow up treatment.  (Tr. 892).  She had

recently been hospitalized for diabetic ketoacidosis[4].  (Tr. 892).  Although she suffered from

bilateral leg edema, she was not otherwise in acute distress during this examination.  (Tr. 892).

Dr. Justin assessed insulin dependent diabetes mellitus, diabetic ketoacidosis, edema, IBS,

gastropathy, malabsorption, and anxiety.  (Tr. 892).  He continued plaintiff's medications,

discussed placement of an insulin pump, and instructed plaintiff to follow up with an

endocrinologist.  (Tr. 894).

On August 6, 2018, plaintiff again consulted Dr. Justin for a hospital follow up.  (Tr.

895).  She had recently been admitted due to right foot pain, a possible bone infection in her

ankle, and complications of diabetes mellitus.  (Tr. 895).  Plaintiff continued to experience

---

[4] Diabetic ketoacidosis is a serious complication of diabetes that occurs when your body produces high levels of blood acids called ketones. https://www.mayoclinic.org/diseases-conditions/diabetic-ketoacidosis/symptoms-causes/syc-20371551 (last visited 2/17/2022).

digestive problems, but they were well treated with medication at that time.  (Tr. 895).  She also had a "blisterous" skin lesion on her heel and a diabetes-related skin lesion on her leg.  (Tr. 895).  Dr. Justin assessed bilateral ankle edema, right calcaneus osteomyelitis, IBS symptoms, and decreased pulses in her extremities.  (Tr. 896).  He continued her medications, referred her for an MRI on her right foot, and prescribed ciprol, an antibiotic used to combat infections in bones, joints, and certain internal organs.  (Tr. 897).

On October 17, 2018, Dr. Justin signed a three-sentence letter addressed "To Whom it May Concern."  (Tr. 790).  It stated:

> [Plaintiff] has been a patient in my office since 08/25/17.  I believe that due to her chronic medical conditions she is incapacitated to do any work or school activities.  Her incapacitation for work or school is lifelong.

(*Id.*).

On November 14, 2018, plaintiff presented for hospital follow up after suffering Charcot[5] of the right lower extremity in August.  (Tr. 900).  She also suffered with complications of diabetes mellitus and IBS symptoms, including trouble controlling her bowels during the night.  (Tr. 900).  She continued treatment with both an orthopedic surgeon and an endocrinologist, as well as Dr. Justin.  (Tr. 900).  Dr. Justin noted that her right leg was in a boot and that she had bilateral neuropathy.  (Tr. 900).  His diagnoses included diabetes mellitus, pancreatic insufficiency, IBS, anxiety, and Charcot of the right lower extremity.  (Tr. 902).  He

---

[5] "Charcot foot is a rare but serious complication that can affect persons with peripheral neuropathy, especially those with diabetes mellitus.  Charcot affects the bones, joints, and soft tissues of the foot or ankle.  The bones become weak and can break and the joints in the foot or ankle can dislocate.  If not caught in its earliest stage, the joints in the foot collapse and the foot eventually becomes deformed.  A deformed foot can cause pressure sores to develop in the foot or ankle. An open wound with foot deformity can lead to an infection and even amputation." https://my.clevelandclinic.org/health/diseases/15836-charcot-foot (last visited on 2/16/2022).

continued plaintiff's medications, and instructed her to follow up with the orthopedic surgeon for Charcot and for a blood clot found behind her right knee.  (Tr. 902).

Plaintiff saw Dr. Justin for an annual examination on February 13, 2019.  (Tr. 903).  He noted that plaintiff had been unable to work even though her diabetes mellitus was better controlled because she continued to have pancreatic insufficiency, IBS-related bowel problems, neuropathy and Charcot right foot (although she is "recovering, able to walk better, no walker"). (Tr. 903).  On physical examination, plaintiff exhibited trace edema bilaterally of her extremities, right heal pain, and bilateral neuropathy of both legs.  (Tr. 904).  Dr. Justin noted that her A1-c level was up to 10.4 (from 8.9 previously), that she suffered from neuropathic pain in both legs, pancreatic insufficiency, loose stools, "healing" Charcot of right foot, and controlled depression. (Tr. 905).

Also on February 13, 2019, Dr. Justin wrote a letter indicating that plaintiff "is not able to lift anything over 20 lbs. and is not able to sit or stand for extended periods of time."  (Tr. 907). He further stated that "[h]er medical conditions are severe enough that she is frequently hospitalized throughout the year" and "her incapacitation to work or participate in school activities is life long."  (*Id.*).

On March 5, 2019, Dr. Justin completed a formal medical statement assessing plaintiff's ability to perform work-related activities.  (Tr. 909-12).  In it, he opined that plaintiff could regularly work zero hours per day, could stand or walk for one-half hour per day, and could stand or walk without interruption for one-half hour per day.  (Tr. 909).  Although he indicated that sitting is not affected by her impairments, he stated she could sit for "N/A" hours per

11

workday and without interruption.  (Tr. 910).  Dr. Justin opined that plaintiff could carry five

pounds occasionally and five pounds frequently; occasionally balance; less than occasionally

kneel; and never climb, stoop, crouch or crawl.  (Tr. 910).  He indicated she could constantly

reach, see, hear, and speak; occasionally handle and finger; and less than occasionally push or

pull.  (Tr. 911).  Although he indicated that her diabetic neuropathy caused environmental

restrictions, including working around moving machinery and being exposed to temperature

extremes, chemicals, dust, noise, fumes, humidity, and vibrations, Dr. Justin did not rate the

extent of those restrictions ("none/moderate/other").  (Tr. 911).

   *5. Dr. Robert Raines, M.D.*

   Dr. Raines, an orthopedic surgeon specializing in foot and ankle abnormalities, treated

plaintiff's orthopedic concerns.  During her September 11, 2018 office visit, plaintiff presented

with a "[c]losed displaced fracture of right calcaneus" and "diminished sensation consistent with

neuropathy" in her right lower extremity.  (Tr. 857-58).  Radiographs indicated a "right calcaneal

tuberosity fracture from Charcot neuropathy."  (Tr. 858).  Dr. Raines instructed plaintiff to

remain non-weight bearing and in a boot with a rolling walker for at least two additional weeks

and would "consider advancing her to weightbear in the boot at that time."  (*Id.*).  He further

prescribed repeat x-rays six weeks later at which point they could "discuss advancing her back to

full weightbearing."  (*Id.*)

   On October 23, 2018, plaintiff revisited Dr. Raines as instructed.  (Tr. 860).  Plaintiff

continued to have neuropathic foot pain in her right foot, and "the fracture [was] healing slowly."

(Tr. 862).  Dr. Raines performed an electromyography, and permitted her "to start coming out of

the boot and transitioning to regular shoes . . . [with] activity as she can tolerate." (*Id.*). He prescribed gabapentin for her neuropathic pain. (Tr. 862-63).

On January 22, 2019, plaintiff returned for "follow up on her right calcaneal tuberosity fracture and peripheral neuropathy." (Tr. 864). She indicated that she "has good and bad days" and "[s]ome days the pain is unbearable." (*Id.*). Plaintiff still required the boot "at times." (*Id.*). X-rays indicated that "that the fracture is healing well," but she continued to have neuropathic pain and "will continue to wear the boot when she has a lot of pain." (Tr. 866). Dr. Raines permitted her to engage in activity "as tolerated." (*Id.*).

He completed a medical assessment form on March 19, 2019. (Tr. 914-17). Dr. Raines indicated that plaintiff could stand or walk one hour per eight-hour workday and one uninterrupted hour without swelling, deformity and pain. (Tr. 914). He concluded that she could sit eight hours per workday and eight hours without interruption, but she could carry only 10 pounds occasionally and five pounds frequently. (Tr. 915). He further opined that plaintiff "is not strong enough to balance and walk" and could never climb, balance, stoop, crouch, kneel, or crawl. (Tr. 915). According to Dr. Raines, plaintiff could constantly see, hear and speak; reach and finger frequently; handle occasionally; and push or pull less than occasionally. (Tr. 916). He concluded that plaintiff "cannot be exposed to" heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, or vibrations. (Tr. 916).

### 6. Dr. Padma Mangu, M.D.

Dr. Mangu, an endocrinologist, treated plaintiff's diabetes mellitus. (Tr. 877). During her December 6, 2017 office visit, plaintiff denied nausea, diarrhea, constipation, tingling,

13

numbness, anxiety, and depression. (Tr. 877). Dr. Mangu prescribed Novolog and Lantus Solostar to help plaintiff manage her diabetes. (Tr. 878-79).

    *7. Dr. Richard Curry III, M.D.*

    Dr. Curry, a neurologist, treated plaintiff's neuropathy and numbness in her hands, fingers, legs and feet. (Tr. 60-61). On January 13, 2019, Dr. Curry noted that plaintiff suffered from numbness in both feet that can extend up both shins and give the "sensation of walking on legos and hot pokers." (Tr. 869). He also noted "some numbness and paresthesias in her fingertips." (Tr. 869). Although Dr. Curry does not treat IBS, plaintiff denied gastrointestinal difficulties, anxiety, and depression during her January 13, 2019 examination. (Tr. 872). His examination revealed both "[d]ecreased vibration and temperature in her toes" although she exhibited "[n]ormal gait." (Tr. 873). The electromyography performed on October 24, 2018 indicated an "[a]bnormal study of both lower limbs" with "moderate, generalized sensorimotor peripheral neuropathy affecting axons and myelin of bilateral lower limbs" and "[c]linically suspect right Charcot ankle inflammation and tenosynovitis also contributing to right foot symptoms." (Tr. 873). Dr. Curry increased her gabapentin from 400 mgs to 1200 mgs and instructed her to return in three months. (Tr. 873-74).

    **E. Specific Errors**

    On appeal, plaintiff contends: (1) the ALJ improperly evaluated the medical source opinions, in particular, crediting the prior administrative medical findings in determining plaintiff's residual functional capacity ("RFC") and failing to provide the rationale for finding unpersuasive the medical source opinions of Michael Justin, M.D., and Robert Raines, M.D.; (2)

the ALJ's analysis of plaintiff's subjective complaints is not supported by substantial evidence; and (3) the ALJ's hypothetical questions to the VE omitted limitations from plaintiff's IBS impairment and Charcot foot.  (Docs. 17 and 21).

### F.  The ALJ's evaluation of the medical opinion evidence is not supported by substantial evidence.

For claims filed on or after March 27, 2017, new regulations apply for evaluating medical opinions.  *See* 20 C.F.R. § 404.1520c (2017); *see also* 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).  These new regulations eliminate the "treating physician rule" and deference to treating source opinions, including the "good reasons" requirement for the weight afforded to such opinions.[6]  *Id.*  The Commissioner will "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)[7], including those from your medical sources."  20 C.F.R. § 404.1520c(a).  Rather, the Commissioner will consider "how persuasive" the medical opinion is.  20 C.F.R. § 404.1520c(b).

In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, including length of

---

[6] For claims filed prior to March 27, 2017, a treating source's medical opinion on the issue of the nature and severity of an impairment is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).  *See also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  "The Commissioner is required to provide 'good reasons' for discounting the weight given to a treating-source opinion." *Id.* (citing 20 C.F.R. § 404.1527(c)(2)).

[7] A "prior administrative medical finding" is defined as "[a] finding, other than the ultimate determination about whether the individual is disabled, about a medical issue made by an MC [medical consultant] or PC [psychological consultant] at a prior administrative level in the current claim."  82 Fed. Reg. 5844-01, 2017 WL 168819, at *5850.  For clarity, the Court will refer to the limitations opined by the state agency reviewing physicians and psychologists as "assessments" or "opinions."

treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship, (4) specialization, and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5). The most important factors the ALJ must consider are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). With respect to the supportability factor, "[t]he more relevant the objective medical evidence[8] and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). Similarly, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s). . . ." 20 C.F.R. § 404.1520c(c)(2). The ALJ is required to "*explain* how [he/she] considered the supportability and consistency factors for a medical source's medical opinions" in the written decision. 20 C.F.R. § 404.1520c(b)(2) (emphasis added). Conversely, the ALJ "may, but [is] not required to, explain" how he/she considered the relationship, specialization, and other factors set forth in paragraphs (c)(3) through (c)(5) of the regulation. *Id.* However, where two or more medical opinions or prior administrative findings about the same issue are equally persuasive, the ALJ must articulate how he or she "considered the other most persuasive factors in paragraphs (c)(3) through (c)(5). . . ." 20 C.F.R. § 404.1520c(b)(3). Finally, the ALJ is not required to articulate how he or she considered evidence from nonmedical sources. 20 C.F.R. § 404.1520c(d).

Plaintiff contends the ALJ's evaluation of the medical opinion evidence in this case is not supported by substantial evidence and is contrary to the above regulations. Plaintiff argues the

---

[8] Objective medical evidence is defined as "signs, laboratory findings, or both." 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5850.

ALJ unreasonably found persuasive the opinions of the state agency consultants, doctors who did not have the benefit of the additional information submitted in this case, including the evidence of plaintiff's Charcot heel fracture and neuropathy.  Plaintiff also contends the ALJ misstated the record in evaluating the opinions of Drs. Justin and Raines, who imposed limitations inconsistent with an RFC for light work.

In this case, the ALJ evaluated the medical opinions from Dr. Justin and found them unpersuasive.  (Tr. 32-33).  The ALJ found Dr. Justin's October 17, 2018 opinion that plaintiff was permanently "incapacitated to do any work or school activities" (Tr. 790) unpersuasive because it lacked both context and rationale and opined on an issue (i.e., disability) that is reserved to the Commissioner.  (Tr. 33, citing 20 C.F.R. § 404.1527(e)).  The Court finds no error in this regard, and plaintiff concedes as much.  (Doc. 17 at PAGEID 1000).  *See Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) (opinion by medical source on issues reserved to Commissioner is never entitled to controlling weight or special significance); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The ALJ also determined that Dr. Justin's other opinions were unpersuasive:

The undersigned finds the opinion evidence from Dr. Michael Justin, M.D., dated February 13, 2019, unpersuasive (Exh. 24F; 25F).  Dr. Justin stated that the claimant was unable to lift anything over 20 lbs., unable to sit or stand for extended periods of time; that her conditions are severe enough that she would be frequently hospitalized throughout the year and that she was permanently incapacitated to participate in school or work activities.  Id.  Though Dr. Justin is a treating source who would ordinarily be familiar with the claimant's treatment history, clinical presentation and functional limitations, his opinion did not provide any context or rational [sic].  Also, his opinion as to the frequency in which she is able to walk in an eight-hour work day is inconsistent with the claimant's own testimony regarding her ability to shop in stores, perform laundry related activities and alleged frequency of restroom use (Exh. 25F/2). . . .

(Tr. 33).

Here, the ALJ cited two reasons for finding Dr. Justin's February and March 2019

opinions unpersuasive: there was no context or rationale for the opinions and the limitations he

expressed were inconsistent with plaintiff's daily activities.  As noted above, the ALJ is required

to explain how she considered the supportability and consistency factors in the written decision

in determining whether a medical opinion is persuasive.  20 C.F.R. § 404.1520c(b)(2).  In

evaluating the supportability factor, the ALJ is required to consider the relevant objective

medical evidence and supporting explanations provided by the medical source.  20 C.F.R. §

404.1520c(c)(1).  In evaluating the consistency factor, the ALJ must compare the opinion with

evidence from other medical sources and nonmedical sources.  20 C.F.R. § 404.1520c(c)(2).  The

ALJ's decision falls short of these regulatory requirements.

The ALJ alleged that Dr. Justin provided no context or rationale for his opinions, without

any further elaboration.  Contrary to the ALJ's decision, the context of Dr. Justin's opinions was

set forth in Dr. Justin's March 5, 2019 medical assessment of ability to do work-related

activities.  (Tr. 909-12).  Dr. Justin explained that his opinion was rendered after he had treated

plaintiff for two years for insulin dependent diabetes mellitus (for 15 years), IBS (for 2 years),

and fractures for one year.  (Tr. 912).  Dr. Justin also explained that the limitations on postural

activities (climb, balance, stoop, crouch, kneel and crawl) were based on plaintiff's right foot

Charcot fracture, diabetic neuropathy, and "some" balance problems.  (Tr. 910).  In assessing

plaintiff's walking limitations, Dr. Justin explained that plaintiff has multiple medical problems,

including IBS with diarrhea, some pancreatic insufficiency, fifteen years with insulin dependent

diabetes mellitus with diabetic neuropathy, and right foot Charcot fracture. (Tr. 909). Dr. Justin's treatment records of plaintiff document weight loss from IBS, that plaintiff frequently soiled herself at night, and that she appeared emaciated and weak. (Tr. 884). The notes show plaintiff experienced leg cramps, neuropathy, fatigue, and malabsorption (Tr. 889); diabetic ketoacidosis, for which she was hospitalized (Tr. 687, 892); bilateral leg edema (Tr. 892); right foot pain, a possible bone infection in her ankle, and complications of diabetes mellitus for which she was hospitalized (Tr. 716-720, 895); "blisterous" skin lesion on her heel and a diabetes-related skin lesion on her leg (Tr. 895); bilateral neuropathic pain of the extremities, Charcot of the right lower extremity, uncontrolled bowels at night, bilateral neuropathy, and pancreatic insufficiency (Tr. 900-902); neuropathic pain in both legs, pancreatic insufficiency, loose stools, and "healing" Charcot of right foot (Tr. 905). The ALJ failed to articulate why Dr. Justin's treatment notes did not support his opinion.

"Although the new standards are less stringent in their requirements for the treatment of medical opinions, they still require that the ALJ provide a coherent explanation of his reasoning." *White v. Comm'r of Soc. Sec.*, No. 1:20-cv-588, 2021 WL 858662, at *21 (N.D. Ohio Mar. 8, 2021). The ALJ is required to "*explain* how [he/she] considered the supportability and consistency factors for a medical source's medical opinions" in the written decision. 20 C.F.R. § 416.920c(b)(2) (emphasis added). As other courts have clarified:

> The new regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'" *Warren I. v. Comm'r of Soc. Sec.*, No. 20-495, 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)). An "ALJ's failure . . . to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [claimant's] disability

19

determination was supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021).

*Hardy v. Comm'r of Soc. Sec.*, ___ F. Supp. 3d ___, 2021 WL 3702170, at *4 (E.D. Mich. 2021); *see also Butcher v. Comm'r of Soc. Sec.*, No. 2:20-CV-6081, 2021 WL 6033683, at *4 (S.D. Ohio Dec. 21, 2021) (same quotation). "[A] district court cannot uphold an ALJ's decision, even if there 'is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.'" *Ephraim v. Saul*, No. 1:20CV00633, 2021 WL 327755, at *7 (N.D. Ohio Jan. 8, 2021), *report and recommendation adopted sub nom. Ephraim v. Comm'r of Soc. Sec.*, No. 1:20CV633, 2021 WL 325721 (N.D. Ohio Feb. 1, 2021) (quoting *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011)). Without an explanation why Dr. Justin's opinions were not supported, the Court is unable to conclude that the ALJ satisfied the regulatory requirements.

Likewise, the ALJ erred in evaluating the consistency factor of 20 C.F.R. § 404.1520c(c)(2) in assessing Dr. Justin's opinions. The ALJ determined that Dr. Justin's opinion on plaintiff's ability to walk in an 8-hour workday was inconsistent with plaintiff's testimony about her ability to shop in stores, perform laundry related activities, and alleged frequency of restroom use. (Tr. 33). There are two problems with the ALJ's approach. First, in evaluating the consistency factor, the ALJ must compare the opinion evidence with not only the nonmedical sources but "with the evidence from other medical sources" as well. 20 C.F.R. § 404.1520c(c)(2) (consistency of medical opinion is compared "with the evidence from other medical sources *and* nonmedical sources in the claim") (emphasis added). The ALJ failed to articulate whether Dr. Justin's opinions were consistent with the other medical source evidence.

The evidence from the other medical sources indicates that plaintiff was hospitalized four times for her underlying health conditions during the relevant time period. (Tr. 687, 716-20, 757, 768). She was non-weight bearing for six months as a result of a right calcaneal tuberosity fracture from Charcot neuropathy, verified by MRI evidence. (Tr. 744, 858, 866). Electromyography and clinical examination by plaintiff's neurologist, Dr. Curry, confirmed numbness and paresthesias in her upper and lower extremities that appear consistent with the limited walking and fingering abilities opined by Dr. Justin. (Tr. 869-874). The ALJ failed to explain how she considered the consistency factor in evaluating Dr. Justin's medical opinions as required by the regulations. 20 C.F.R. § 404.1520c(b)(2).

Second, the record does not substantially support the ALJ's reasons for concluding that Dr. Justin's limitations are inconsistent with plaintiff's daily activities. The ALJ's characterization of plaintiff's testimony of her daily activities is incomplete. The ALJ's decision states that plaintiff's testimony regarding her ability to "shop in stores, prepare meals, perform laundry related activities and alleged frequency of a restroom" was inconsistent with Dr. Justin's opined limitations. (Tr. 33). When asked by the ALJ at the hearing whether she prepared simple meals or microwaved, "shopped for food, clothes, or personal items," or "[p]ut clothes in the washer, take them out, put them in the dryer" plaintiff responded "yes." (Tr. 64-65). Plaintiff clarified in her testimony, however, that she is able to do laundry, but she requires elevated laundry hampers because she is frequently unable to bend, stoop or squat to pick up items. (Tr. 67-68). Her primary hobby is coloring (Tr. 65), she can lift five to eight pounds, and her friend comes to her house to "hang" because she is "not allowed to go out alone." (Tr. 69). Plaintiff

21

was not asked whether she required breaks or to sit down while performing these household tasks nor whether she could stand or walk for periods longer than an hour. In her disability report on appeal, plaintiff clarified that in terms of her daily activities, she "does what she can but needs frequent breaks if she does anything. Needs to get help from others." (Tr. 231). Indeed, she testified that she took her son shopping for school supplies, but the shopping trip resulted in her size seven foot swelling so much she required a size twelve shoe (Tr. 66-67), and she was subsequently prescribed diabetic shoes. (Tr. 920). In response to a written functional report from Social Security that requested specific information about plaintiff's daily activities and limitations, plaintiff explained that it was "difficult to put [her] socks and shoes on, difficult standing in the shower, and she can't get up out of [a] tub"; she could make "easy snacks" that took about 10 minutes due to the standing and walking, and she did not prepare "big" meals because it "takes too long to stand that long and I hurt and get frustrated"; she stated she "can sometimes start laundry, but never can complete start to finish" and she needs to take breaks; she shopped for groceries about twice a month, which "usually takes about 1-2 hours"; she stated she could walk "a couple of feet" before needing to stop and rest and needed to rest "at least a half an hour or more depending on the swelling"; and she drove only when someone is with her "in case my legs get too swollen/hurtful and only short trips." (Tr. 238-242). The limited testimony elicited from plaintiff by the ALJ affirming she could "shop in stores, prepare meals, perform laundry related activities," without more, is not substantial evidence to support the ALJ's conclusion that plaintiff's daily activities showed a greater capacity for standing and walking than opined by Dr. Justin. Nor is the Court able to discern how plaintiff's "alleged frequency of

22

restroom use" (Tr. 33) indicates a greater ability to walk than opined by Dr. Justin. Without

further explanation by the ALJ on how she evaluated the consistency of Dr. Justin's opinions, the

Court is unable to conclude that the ALJ complied with the requirements of 20 C.F.R. §

404.1520c(c)(2).

The ALJ's evaluation of Dr. Raines' opinion is likewise deficient. Dr. Raines opined that

plaintiff was limited in her ability to stand or walk for one hour per eight-hour workday due to

swelling, deformity and pain and could lift and carry only 10 pounds occasionally and five

pounds frequently. (Tr. 914-915). The ALJ determined that Dr. Raines' opinion was

unpersuasive, but there is nothing in the ALJ's decision that discusses the supportability of Dr.

Raines' decision in accordance with 20 C.F.R. § 404.1520c(b)(2) (ALJ is required to "explain

how [he/she] considered the supportability and consistency factors for a medical source's

medical opinions" in the written decision). "The supportability factor considers how relevant the

objective medical evidence and supporting explanations supporting a medical opinion are."

*Reed v. Comm'r of Soc. Sec.*, No. 3:20-cv-02611, 2021 WL 5908381, at *6 (N.D. Ohio Dec. 14,

2021) (citing 20 C.F.R. § 404.1520c(c)(1)). The ALJ's failure to discuss the objective evidence

and supporting explanations underlying Dr. Raines' opinion requires a remand because "without

fuller explanation, this court cannot engage in meaningful review of the ALJ's decision." *Id.*

(quoting *Todd v. Comm'r of Soc. Sec.*, No. 3:20-cv-1374, 2021 WL 2535580, at *8 (N.D. Ohio

June 3, 2021)).

Finally, the ALJ determined the opinions of the state agency physicians who opined that

plaintiff could perform a reduced range of light work, including standing and walking for

approximately six hours in an eight-hour workday, were "persuasive."  (Tr. 32).  However, and contrary to the Commissioner's representation in this case (Doc. 20 at PAGEID 1026), the ALJ gave absolutely no reasons explaining why these opinions were persuasive and never addressed the supportability and consistency factors as required under 20 C.F.R. § 404.1520c(b)(2).

The ALJ did note that evidence received subsequent to these opinions, specifically the combined effects of plaintiff's diabetes mellitus, peripheral neuropathy, Charcot of the right heel and irritable bowel syndrome, resulted in additional limitations to plaintiff's RFC to accommodate these conditions.  (Tr. 32).  The Commission contends that the ALJ properly imposed additional restrictions to account for these conditions, to wit: the manipulative limitation of "frequent finger and handle bilaterally" and environmental restrictions including the avoidance of concentrated exposure to heights, dangerous moving machinery, and extreme heat, cold, dust, humidity, vibration, and more than moderate noise levels.  (Tr. 27).  However, the Court is unable to discern from the ALJ's decision how this single manipulative limitation and the environmental restrictions imposed by the ALJ account for the standing and walking limitations assessed by Drs. Justin and Rainey.

Because the ALJ never articulated why the state agency consultants' opinions were supported by or consistent with the record evidence, the Court is unable to discern the rationale for the standing and walking abilities (6 hours per day) given by the state agency doctors, especially in light of the evidence of the limitations opined by Drs. Justin and Rainey.  Indeed, the objective and clinical evidence strongly suggest that the limitations imposed by plaintiff's

24

physicians are consistent with and supported by the medical evidence.  For these reasons, the Court sustains plaintiff's first assignment of error.

### G.  The Court need not reach plaintiff's remaining assignments of error.

It is not necessary to address plaintiff's remaining assignments of error.  Because this case should be reversed and remanded for the ALJ to reconsider and reweigh the medical opinions of record, this may impact the remainder of the ALJ's analysis, including the ALJ's evaluation of plaintiff's subjective complaints and the proper hypothetical questions to be posed to the VE.

In any event, even if these assignments of error have merit, the result would be the same, i.e., remand for further proceedings and not outright reversal for benefits.  *See Mays v. Comm'r of Soc. Sec.*, No. 1:14-cv-647, 2015 WL 4755203, at *13 (S.D. Ohio Aug. 11, 2015) (Report and Recommendation) (Litkovitz, M.J.), *adopted*, 2015 WL 5162479 (S.D. Ohio Sept. 3, 2015) (Dlott, J.).

### III. This matter is reversed and remanded for further proceedings.

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the undersigned notes that all essential factual issues have not been resolved in this matter.  *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).  This matter is reversed and remanded for further proceedings with instructions to the ALJ to re-weigh the medical opinion evidence in accordance with this decision; to reassess plaintiff's RFC; to reassess plaintiff's subjective complaints; and for further medical and vocational development.

**IT IS THEREFORE ORDERED THAT:**

Based on the foregoing, plaintiff's statement of errors (Doc. 17) is **SUSTAINED**, and the Commissioner's non-disability finding is **REVERSED AND REMANDED FOR FURTHER PROCEEDINGS** consistent with this Order.

Date:  3/28/2022

Karen L. Litkovitz
United States Magistrate Judge